**SCHRAM et al. v. PEARL OIL CORPORATION et al.**

No. 8088.

Court of Civil Appeals of Texas. Austin.

Jan. 22, 1936.

Rehearing Denied Feb. 12, 1936.

Wilcox & Graves and W. H. Nunn, all of Georgetown, and Dan Moody and J. B. Robertson, both of Austin, for appellants.

J. F. Taulbee and D. B. Wood, both of Georgetown, Hamilton, Hamilton & Turner, of Dallas, and Black & Graves, of Austin, for appellees.

McCLENDON, Chief Justice.

Appeal by plaintiffs below from an adverse judgment rendered upon a directed verdict at the close of plaintiffs' evidence, in a suit which plaintiffs describe as follows: "This suit was brought by Albert Schram, Herbert Burns, D. C. Matthews and Charles Rolff, against J. C. McNeill and the Pearl Oil Corporation and Ward Powell as Receiver, to establish an interest in the profits .and proceeds of an oil and mineral lease on .approximately two hundred acres of land in the East Texas oil field in Rusk County, Texas, and for an accounting of a mining partnership."

.Since we have reached the conclusion that the trial court's judgment should be sustained for want of consideration upon each of the two asserted theories of recovery (interest in the lease and mining partnership), we will confine our statement to the record showing pertinent to that issue.

This conclusion results from our construction of the record as evidencing, without any substantial doubt, that the dominant or only consideration for plaintiffs' claim was the use of a divining rod, usually referred to as a "wiggle-stick" or "doodle-bug," in the exploration for oil, which we do not regard as constituting a substantial or valid consideration cognizable in a court of justice.

McNeill and Matthews had been engaged in oil prospecting and development (buying and selling leases and drilling oil wells) since 1926. Their business was begun as a partnership; but in January, 1930, they formed a corporation under the name of McNeill & Matthews, Inc. Since then their joint business has been transacted by the corporation, the stock of which is owned 49 per cent. each by McNeill and Matthews, and 1 per cent. each by their wives. Since the organization of the corporation and until about the time this suit was filed in May, 1933, Matthews had devoted his entire time to the corporation.

Rolff was a farmer living in the northeastern portion of Travis county. He was the inventor and owner of the "doodlebug," which Schram described as follows: "As far as I know, the gentleman who owns it says it is a secret; he claims it is an invention of his own which he doesn't want to reveal to anybody, but the tube proper, what's supposed to do this exploring, is about six inches long, and in this tube he has his secret, which he has never revealed to anybody, and it is sealed at both ends, and at one end there is an opening to attach to this fork, and the fork is about fifteen or sixteen inches long and has two handles to it; a man takes this fork in both hands with the tube up and holds it over the land or leases, and by some way he can tell whether the land has potential oil bearing possibilities or whether it is dry."

Only certain individuals, supposed to possess the requisite attributes, could operate the "doodle-bug." Among these was Sake-

witz, a tenant on one of Schram's farms. Schram and Burns were farmers living some eight miles to the north of Rolff in Williamson county. On June 16, 1930, a contract was executed by the three and Mrs. Rolff, reciting that they "hereby form a company for the purpose of locating oil." Each of the four was to have 25 per cent. "voting power," but Rolff, Burns, and Schram alone were to share (each equally) "in the proceeds of the company."

The other portions of the agreement read:

"Charles Rolff, joined by his wife, agrees to furnish all his oil locating machines exclusively for the use of the company. He agrees to call in all machines now out of his possession and at no time hereafter will he issue a machine of any description to anyone other than a member of the company. He agrees to turn over to Herbert Burns, who shall be responsible for the safety of them, all machines to be made or used by anyone. He will keep same in a safety box in the Taylor National Bank and be taken out only with the consent of the company; then to be used for financial benefit, of the company only.

"It is especially agreed that the company will make locations for Fritz Fuchs, when such locations are to be drilled by himself and for his personal benefit. It is especially agreed that Charles Rolff shall receive all of the proceeds from Fritz ·Fuchs for such first location, but the proceeds from all other work thereafter shall become the property of the company. At no time shall a Rolff made oil machine of any description remain in the possession of anyone not a member of the company.

"It is especially agreed that the above terms shall be strictly enforced for the next eighteen months and if at that time the company has not financially benefited the members, then Charles Rolff shall not be responsible for any debts incurred by the company. The company will make satisfactory agreement with Mrs. Charles Rolff for the use of the Super Machine."

What the "super machine" was the record does not disclose, other than as may be inferred from its name and its place in a contract creating a company for the discovery of oil. It does not appear to have figured in the case.

The Pearl Oil Company was chartered January 30, 1930, with $10,000 capital stock, owned $9,800 by A. E. Camp, and $100 each by McNeill and wife, Pearl McNeill; the three constituting its board of directors.

Some time after this suit was filed, McNeill testified in a receivership proceeding that he and his wife owned 99 per cent. of the stock and a nephew the remaining 1 per cent. Just when the change in ownership took place does not appear; but that is not important in the view we take of the case.

Some time prior to October 8, 1930, Burns, Schram, and McNeill & Matthews, Inc., had acquired a number of oil leases in Williamson county covering about 1,400 acres. On that date an agreement was executed by McNeill & Matthews, Inc., reciting that the Pearl Oil Company, in consideration of drilling, was to own one-half of these leases, and the other one-half was to be owned by a corporation to be formed, one-half the stock of which to be owned by Burns and Schram and one-half by McNeill & Matthews, Inc. This corporation was never formed, and plaintiffs contend that this fact constituted Burns, Schram and McNeill & Matthews, Inc., a mining partnership under an alleged general agreement or understanding to acquire oil leases. Neither Burns nor Schram ever put any money or other property into the concern, and their only contribution was the use of the "doodlebug" and assistance in obtaining leases.

Schram and Burns both testified that they represented to McNeill that the "doodlebug" in their opinion was efficacious in exploring for oil. To quote from Schram: "I told him this man had an instrument which I thought was a great aid in locating possible producing oil lands." "I recommended it." "Told him it was a good instrument, and it would work."

This from Burns' testimony: "Q. You claimed to McNeill that you had a man with an instrument that could locate oil? A. Not only locate it, but a chance to find oil."

Matthews testified: "They (Burns and Schram) said they had a man that had an instrument that they believed could take the biggest part of the risk out of wild-catting."·

The instant suit is predicated upon an exploration trip made by Burns and Schram, accompanied by Sakewitz and the "doodlebug," to the East Texas oil field early in January, 1931, at the request of McNeill, and the negotiations entered into during that trip.

On the night of January 3 or 4, 1931, McNeill, who was then at Henderson, telephoned to Matthews at Taylor, requesting · that he get in touch with Burns and Schram with a view of getting them to come to · Henderson with the "doodle-bug" and Sake-

witz, "to help find a lease on the East Texas field." It will be recalled that the discovery well (Joiner) of that field had been brought in in September, 1930. At the time of this incident (January, 1931), there were only three or four producing wells in this field, and the proven area covered only about 1 or 1½ miles. In response to this request, Burns, Schram, and Sakewitz, with the "doodle-bug," left Taylor that night on the midnight train, arriving at Henderson about 8 o'clock the following morning. They were met by McNeill, and taken to a hotel, where McNeill had engaged rooms for them. McNeill told them he had an offer of a lease on a 200-acre tract (Milstead) at $200 per acre; and he had a man (Vitek) who had a rig on a siding ready to start drilling under an agreement to pay $10,000 in cash and $10,000 in oil for a 100-acre lease, contingent upon discovering oil on the lease. He wanted the Milstead tract tested by the "doodle-bug," and also general exploratory tests made in the vicinity.

They first drove over the proven field around the Joiner well, but did not use the "doodle-bug" there. They next went over the Milstead tract, using the "doodle-bug." For the next two or three days they drove over other lands in the vicinity using the "doodle-bug." On January 6th, they discovered a tract of 200 acres (the Eaton tract) which showed very favorable "doodle-bug" indications. Shortly thereafter they stopped at a country store to get a cold drink. There they met Eaton, who owned the store and the 200-acre tract. They learned from him that he was willing to lease the tract for $9,000, provided the lessee would agree to drill a well. They obtained his promise that he would hold the offer open for them until the next day. That night they reported the matter to McNeill, informing him that the lease showed better "doodle-bug" indications than the Milstead lease, was a great deal cheaper, and they advised him to buy it. The agreement constituting the basis of the suit was then entered into, which was in substance as follows: McNeill was to buy the lease, paying the consideration and taking title in his own name; he was to have the exclusive control of the property, with right to develop or dispose of it as he saw fit, and was to be reimbursed out of the proceeds for his outlay, including all expenses. Subject to this right of reimbursement, the lease was to be owned in undivided interests as follows: One-half by McNeill, one-

fourth by Matthews, and one-eighth each by Burns and Schram. McNeill promised to execute an instrument evidencing the interest of each of the parties in accordance with the agreement. This, however, was never done. Up to this time McNeill had never seen the "doodle-bug." This, because of an agreement with Rolff by Burns and Schram that they would not show it to any one. However, on the night of January 6th, after the agreement with McNeill, Burns and Schram agreed between themselves that they ought to show the "doodle-bug" to McNeill, in view of the fact that he was investing so much money in the lease. The next day the four went over the Eaton tract, Sakewitz operating the "doodle-bug," and driving a peg where the instrument showed best indication of oil. They then went to Eaton's place of business, where McNeill was introduced to Eaton by Burns and Schram, and closed the deal for the lease. The title was taken in the name of the Pearl Oil Company. This fact, however, was not known to Burns and Schram until some time later.

It is appellants' contention that the contract was sufficient to raise an express trust in favor of Burns, Schram, and Matthews for the respective interests in the lease, as evidenced by the agreement of January 6, 1931; and that the Pearl Oil Corporation was privy to the agreement, upon the theory either that it was the alter ego of McNeill, or that he was acting for it as its agent. For our present purposes, we will adopt this theory, with the proviso that to constitute such trust a valid consideration was essential.

Burns, Schram, and Sakewitz returned to Taylor the night of January 7th, or the day following. Vitek drilled a well on the spot where the peg had been driven, and brought in a gusher (some 30,000 barrels per day). It should be noted in this connection, however, that both Burns and Schram admitted that (in the light of subsequent events) during the whole time they were exploring with the "doodle-bug," they were traveling over a veritable "ocean of oil," and that if a well had been drilled at any place over which they traveled with the "doodle-bug," a like result would have obtained as at the place where the peg was driven. If there had been any virtue whatever in the "doodle-bug," this would have been indicated. Such, however, was not the testimony of Burns and Schram. Rolff did not appear at the trial, although he had been sub-

pœnaed by appellees; and Sakewitz was not called as a witness.

In May, 1931, McNeill settled with Burns and Schram for their interest in the lease, upon the basis of $2,000 each. This settlement was sought to be set aside upon the ground of fraudulent representations by McNeill to the effect that he had only realized about $16,000 net from the lease and the $2,000 was approximately the share of each. He also told them Matthews had induced him to sell cheap upon the advice that the lease was of little value. Matthews testified that shortly after this settlement McNeill called him up on the phone and, referring to Burns and Schram, said: "I told the boys you advised me to sell all of this Eaton property and you will have to be the goat and take the rap."

On cross-examination, he gave as the reason for not communicating to Burns and Schram the misrepresentation of McNeill to them, the following: "I had too much at stake—I thought I might not come out with anything myself if I did (object)." "He told me he had already told them, and I didn't want to contradict him;·I had been with him a long time and I was just casually acquainted with the boys." "I knew I didn't have anything in writing, and I didn't think he would give me a thing myself, so I had to stay in there and play ball."

Matthews detailed his efforts to get a settlement out of McNeill, the result of which was always to be put off with promises. He finally concluded, a few days before the suit was filed, that "I had to do something drastic to get my money," "so I called him up and he said he wasn't getting any money, and I knew he was, and then I went to Mr. Burns and Schram and told them approximately how much money he had gotten out of that East Texas deal, and well, it just staggered them for awhile." Burns testified that he first learned of McNeill's fraud four or five days before the suit was filed, when "Matthews came to us and told us he thought we had been hooked." Matthews, Burns, and Schram then agreed to bring the suit and divide the proceeds equally.

On account of its conciseness as well as comprehensiveness, we quote in full the article in the latest (fourteenth) edition of Encyclopaedia Britannica on the topic:

"Divining-Rod. The art of using a divining-rod for discovering something hidden is of immemorial antiquity, and the ·Roman virgula divina, used in taking auguries by means of casting bits of stick, is described by Cicero and Tacitus. The particular form of virgula furcata, or forked twig of hazel or willow, described by G. Agricola (De re metallica, 1546), and in Sebastian Munster's Cosmography in the early part of the 16th century, used especially for discovering metallic lodes or water beneath the earth, must be distinguished from the general superstition. The 'dowsing' or divining-rod dates from its use by prospectors for minerals in the German (Harz mountains) mining districts in the 15th century. The Schlagruthe (striking-rod) or forked twig of the German miners was brought to England by the merchant venturers of Queen Elizabeth's days for those engaged in the Cornish mines. As mining declined in Cornwall its use was transferred to water finding.

"In modern times the professional dowser (q. v.) is a 'water finder,' and there has been a good deal of investigation of his claims to be able to locate underground water, where it is not known to exist, by the use of the forked hazel twig which, twisting in his hands, leads him ·by its directing power to the place where a boring should be made. A widespread faith exists, based on frequent success, in the dowser's power. Prof. Sir W. F. Barrett was satisfied that the rod twists without any intention or voluntary deception on the part of the dowser, and ascribed the phenomenon to 'motor-automatism' on the part of the dowser, a reflex action excited by some stimulus upon his mind, which may be either a subconscious suggestion or an actual impression (obscure in its nature) from an external object or an external mind; both sorts of stimulus are possible, so that the dowser himself may infer that the stimulus is an external object (like water). Like the 'homing instinct' of certain birds and animals, the dowser's power lies beneath the level of conscious perception; and the forked twig acts as an index of some material or other mental disturbance within him, which otherwise he could not interpret. Not all dowsers use a rod. Some use a willow rod, or withy, others a hazel twig (the traditional material), others a beech or holly twig, or one from any other tree; others even a piece of wire or watch-spring. The best dowsers have generally been more or less illiterate men, engaged in some humble vocation."

We take judicial knowledge of the scientific fact that there is no virtue whatever in the "doodle-bug" in locating oil or other substance underneath the earth. Appellees have collated from a number of scientific treatises and papers, touching this subject, the following excerpts:

"Victor Ziegler, in his 'Popular Oil Geology,' at page 122 says:

" 'Belief that an oil pool can be located by means of the divining rod, a forked willow twig or by instruments of various sorts is a survival of the superstition of the middle ages fostered by the charlatan. There is no scientific basis for such belief.'

"In U. S. Geological Survey, Water Supply Paper, No. 416, it is said:

" 'It is doubtful whether so much investigation and discussion have been bestowed on any other subject with such absolute lack of positive results. It is difficult to see how for practical purposes the entire matter could be more thoroughly discredited.'

" 'To all inquiries the United States Geological Survey therefore gives the advice not to spend any money for the services of any "water witch" or for the use or purchase of any machine or instrument devised for locating underground water or other minerals.'

"Dorsey Hager, in his book on 'Practical Oil Geology,' at page 103, says:

" 'Prospecting for oil by means of crooked sticks, magnetic instruments, and electrical contrivances is sometimes employed. Where the examining man is an expert oil man, he may determine favorable territory, despite his instruments, but generally such men are "fakers," pure and simple.'

"In Daniel W. Hering's 'Foibles and Fallacies of Science,' it is said:

" 'The supposed laws of the divining rod are absurd. It goes blindfold when the diviner is blindfolded.'

"In 'Current Opinion,' volume 71, at page 672, it is held:

" 'There is no such thing as a "Divining rod" or "Caducean wand" or forked willow branch that can be depended upon as a means of finding buried treasure, mineral deposits and underground oil or water, according to a United States Geological Survey bulletin * * *.'

" 'No instrument other than the drill has been devised that will indicate the presence of water or oil underground. In determining the probable existence of underground supplies of these liquids geologists are guided by their knowledge of the relation of beds of rocks visible at the surface to beds that contain oil or water at other places in the same region. They also make use of the recognized relation of the occurences of oil or water to certain structures in the rocks and surface indications.'

"In volume 76 of 'The Independent,' at page 65, it is said:

" 'This is one of the suspicious things about the divining rod, its marvelous ability to any demands that may be made upon it. It used to be employed to discover heretics and thieves. Nowadays it is used to unearth potash and lignite. How curious that the wand knows so well what is wanted in every case! There are certainly heretics in Halle; also, presumably thieves. Why did not the magic fork turn to one of these instead of pointing out a potash bed liked a trained hunting dog?'

"In volume 96 of 'The Literary Digest,' page 62, there is an interesting article on 'Wiggle-sticking.' The editor quotes Professor J. W. Gregory, from a paper read before the Public Works, Roads and Transport Congress, London. Professor Gregory's paper showed 'that the evidence of all the controlled experimental tests in England of which I know is against water or oil * * * divining.'

"Dr. Hugh R. Mill, who reviewed Dr. Gregory's paper in 'Nature' (London), writes:

" 'The outcome of Professor Gregory's discussion is stated by the Reviewer to be that the use of the divining rod is a survival of primitive magic, and there is no reason to suspect the existence of unrecognized properties of matter or power of mind from the performance of dowsers.'

"In 'Applied Geophysics,' Eve and Keys say:

" 'An engineer or mining man of any repute would not dream of calculating his expenditure, or writing a report based on the findings of a divining rod.'

"In Von Bernewitz's 'Handbook for Prospectors,' at page 38, it is said:

" 'There is no relation between electrical prospecting and geophysics, and dowsing or the divining rod. * * * Of the numerous methods supposed to reveal where ore bodies exist, it would be well if pros-

pectors keep clear of such apparatus as the divining rod. No deposit has yet been discovered by such means.'

"Donald C. Barton, in volume 7, at pages 427-429, of the 'American Association of Petroleum Geologists,' says:

" 'No one of the three wiggle-stickmen was able to delimit the dome even roughly and the three in no way agreed with each other in the reactions obtained.'

"Barton concludes his articles:

" 'If there were something to the wiggle stick, its failure at times to register the presence of a substance might be explained, but that its brilliant registering of substances not present, could not be.' "

It may be regarded as noteworthy that there appears to be no legal literature upon the subject.

Appellants contend that notwithstanding the "doodle-bug" may be useless and the claims concerning its virtue palpably fraudulent, nevertheless the contract sued upon may be supported by the assistance given McNeill in finding and obtaining the lease. We do not think this claim has substantial merit. The record, we think, conclusively shows that whatever assistance or promise of assistance in obtaining leases was given, and particularly as regards the lease in question, was merely incidental to the use of the "doodle-bug" in making locations. But for that no agreement would ever have existed between the parties, and Burns and Schram would not have been requested to go to Henderson. The use of the "doodle-bug" constituted, we believe, the paramount and in fact sole motivating consideration for the contract sued upon.

■ It is further urged that the transaction alleged and proved constitutes an executed trust, to support which a consideration is not necessary. The general principles governing this subject are thus stated in 1 Restatement of the Law of Trusts, §§ 28, 29, and 30, pp. 96, 98, and 99, under the general head of "Consideration":

"Sec. 28. For Declaration of Trust. The owner of property can create a trust of the property by declaring himself trustee of it although he receives no consideration for the declaration of trust.

"Sec. 29. For Transfer in Trust. The owner of property can create a trust of the property by transferring it to another person in trust although there is no con-

sideration other than the transfer of the property.

"Sec. 30. For Promise to Create a Trust. A promise to create a trust in the future is enforceable, if, but only if, the requirements for an enforceable contract are complied with."

Section 28 relates to one owning the property at the time of the declaration, the effect of which would be to constitute him trustee of the property for the benefit of the declaree in the declaration. Such declaration, however, would amount to a conveyance or transfer of title to or interest in land, and would fall squarely within our statute of frauds. There is no writing in evidence by McNeill or the Pearl Oil Company which could be construed as amounting to a declaration of trust. The only writings in evidence were the receipts executed in the settlements with Burns and Schram, and the checks given thereunder. The most that can be drawn from the language of these instruments is an admission that Burns and Schram had some sort of interest in the Eaton lease; the nature, character, or extent of which was not intimated. The instruments taken singly or all together are so palpably insufficient to meet the statutory requirements that we think it unnecessary to set them out here.

Section 29 relates to trusts created by the grantor of conveyed or devised property, and manifestly has no application here.

Section 30 alone could apply, under which a valid consideration is essential to its support.

■ The remaining pertinent assignments relate: (1) To the refusal of the trial court, shortly before the trial, to permit appellants to file (predicated upon newly discovered evidence) an amendment to their pleadings asserting that the money used in acquiring the Eaton lease was derived from the Abbott lease in 1930, which was owned by McNeill and Matthews as equal partners; and (2) to the exclusion of testimony of Matthews regarding his previous financial dealings with McNeill, as partner or otherwise.

The amendment regarding the Abbott lease was properly denied, we think, because it asserted a new and entirely different theory of recovery from that theretofore asserted, and one in which Matthews was the only appellant concerned. The effect of the amendment was to al-

lege a constructive trust by virtue of the use of his funds in the acquisition of the lease, whereby he would be the equitable owner of a one half interest therein. The suit was to establish an express trust in favor of appellants Matthews, Burns, and Schram, predicated upon a contract. Independently of whether these two causes of action might properly have been joined over objection of appellees, we think the trial court properly exercised a discretion which the law vested in it. Had the amendment related to the cause of action upon which the suit was brought, a different question would be presented. But since the amendment set up an entirely new cause of action, predicated upon facts bearing no relation to the cause of action in suit, and in which only one of the appellants had any interest, the court very properly declined to allow it at a time which would have necessitated a continuance of the case.

Independently of this holding, however, the record demonstrates that the ruling, if erroneous, was harmless; since Matthews himself testified that his business with McNeill was incorporated in January, 1930, from which time all their operations were conducted by the corporation, with stock ownership as already noted.

The excluded evidence was offered upon the theory that prior indebtedness of McNeill to Matthews was pertinent as showing an inducement for the contract sued upon.

The evidence regarding advancements to the partnership is exceedingly vague and uncertain; and, moreover, it was to the effect that whatever were the advancements, they were almost entirely from Mrs. Matthews' property.

While it may be conceded that the settlement of a prior debt, whether barred or not, would have supported the contract, it was not pleaded nor otherwise contended that such debt in any way entered into the negotiations of the parties. It therefore formed no part of the consideration, and had no bearing upon the validity of the contract. If the case had advanced to the point that the making vel non of the contract was a controverted issue of fact, these prior relations of the parties might have some bearing on that issue, as it might relate to the probability or reasonableness of the contract. For the purposes of this appeal, however, the mak-

ing of the contract is conclusively presumed; and the issue is only whether the evidence taken most strongly for appellants was sufficient to support a judgment for them. The excluded testimony was not pertinent to that issue.

The trial court's judgment is affirmed.

Affirmed.